STATE OF MICHIGAN

 COURT OF APPEALS

PAULETTE ELHER, FOR PUBLICATION
 November 25, 2014
 Plaintiff-Appellant, 9:05 a.m.

v No. 316478
 Oakland Circuit Court
DWIJEN MISRA, JR., M.D., MURPHY & LC No. 2011-116694-NH
MISRA, M.D., P.C., and WILLIAM BEAUMONT
HOSPITAL,

 Defendants-Appellees,
and

PREFERRED MEDICAL GROUP and
PREFERRED FAMILY MEDICINE,

 Defendants.

Before: BECKERING, P.J., AND HOEKSTRA AND GLEICHER, JJ.

GLEICHER, J.

 Before admitting expert medical testimony, a trial court must ensure that it is not infected
with junk science. Michigan Rule of Evidence 702 and MCL 600.2955 provide trial courts with
the general standards they need to fulfill this gatekeeping obligation. At issue in this medical
malpractice case is how those standards apply to a difference of opinion among highly qualified
experts concerning whether a surgical error constitutes a violation of the standard of care.

 The underlying facts are simple. Defendant Dwijen Misra, Jr., a general surgeon, clipped
the wrong bile duct during plaintiff Paulette Elher’s laparoscopic gallbladder surgery. Plaintiff’s
expert, a general surgeon with extensive experience in the procedure, testified that clipping a
patient’s common bile duct during an otherwise uncomplicated operation is a breach of the
standard of care. Defendants’ expert opined that bile duct injuries frequently occur even absent
professional negligence. Defendants insisted that plaintiff’s expert’s testimony did not qualify as
reliable under MRE 702 because the expert could not specifically identify any peer-reviewed
literature or other physicians who supported his viewpoint. The trial court agreed with
defendants, excluded plaintiff’s expert’s testimony, and dismissed the case.

 -1-
 We hold that the trial court incorrectly applied MRE 702 and abused its discretion by
excluding the testimony of plaintiff’s expert witness—Dr. Paul Priebe. The reliability factors
invoked by the trial court to reject Dr. Priebe’s standard-of-care opinion lacked relevance to the
testimony offered and the evidence received. Neither the soundness of a scientific methodology
nor the legitimacy of underlying data plays a role here. Rather, the experts’ disagreement
focuses on scientifically sustainable and equally justifiable conclusions. MRE 702 requires that
an expert’s opinion rest on reliable scientific principles. Once that foundation has been
established, MRE 702 does not empower trial courts to determine which of several competing
expert opinions enjoys more support. Here, the evidence validated that Dr. Priebe grounded his
opinions in “good science.” Accordingly, a jury must decide whether to credit his views.

 I. FACTS AND PROCEEDINGS

 Dr. Misra removed Elher’s gallbladder laparoscopically. Technically called a
laparoscopic cholecystectomy, this surgery is performed by passing long, narrow instruments
and a magnification camera called a laparoscope through several small abdominal incisions. The
laparoscope transmits images from the surgical site to video monitors in the operating room. The
surgeon manipulates the specialized instruments while viewing the images on the monitors.

 An initial step in the procedure involves careful identification of the cystic artery and the
cystic duct. After locating these structures, the surgeon places clips above and below the point
where each will be divided. The surgeon then cuts the tissue between the clips. Once the cystic
artery and the cystic duct have been severed, the gallbladder is dissected away from the liver bed
and removed from the abdomen. The cystic duct’s continuity must be sacrificed to remove the
gallbladder, but the patient’s other bile ducts, in particular the common bile duct, are supposed to
remain intact.

 Dr. Misra clipped Elher’s common bile duct. Elher’s expert believes that when neither
scarring nor inflammation obscures the surgeon’s vision, it is a breach of the standard of care to
injure the common bile duct. Defendants claim that injuries can happen even in the presence of
due care because the laparoscope creates optical “illusions” that may lead the surgeon astray.
This debate frames the evidentiary issue presented to the trial court.

 Approximately nine weeks after the operation, Elher presented at a hospital with
abdominal pain, nausea, vomiting, and jaundice. A radiologic study called an ERCP revealed
that a clip obstructed her common hepatic duct.1 Surgery was performed to remove the clip and
to reconstruct her biliary drainage system.

1
 The parties and their expert witnesses refer to the clip as having been placed on either the
common hepatic duct or the common bile duct, using the anatomical terms interchangeably. Dr.
Misra stated: “The clip is on the common bile duct because of the surgery that I performed.”
Placement of the clip on either the hepatic or the common bile duct (which are essentially one
continuous structure) was not part of the surgical plan, and the parties agree that this untoward
event triggered Elher’s illness and her need for additional surgery.

 -2-
 Elher subsequently filed this medical malpractice suit. Her complaint avers that the
standard of care applicable to Dr. Misra required that he:

 l. Refrain from clipping or obstructing the common bile duct during the
 performance of a laparoscopic cholecystectomy that is identified as an
 uncomplicated procedure in the operative note.

 2. To unequivocally identify the cystic duct and ensure that no anatomic
 structures are clipped or cut without certain identification.

 3. To convert to an open procedure if there is any doubt as to the proper
 anatomical identification of each element of the biliary tree.

Dr. Misra breached the standard of care, the complaint continues, by:

 l. Fail[ing] to refrain from clipping or obstructing the common bile duct
 during the performance of a laparoscopic cholecystectomy that is
 identified as an uncomplicated procedure.

 2. Failing to unequivocally refrain from clipping or obstructing the common
 bile duct during the performance of a laparoscopic cholecystectomy that is
 identified as an uncomplicated procedure.

 3. Failing to convert to an open procedure if there was any doubt in
 Defendant’s mind as to the proper anatomical identification of each
 element of the biliary tree . . . .

The complaint also stated a res ipsa loquitur claim.

 Elher filed an affidavit of merit signed by Dr. Paul Priebe, a board certified general
surgeon. Dr. Priebe’s affidavit reiterates the standard of care requirements and violations
pleaded in the complaint.

 Dr. Misra denied that he had violated the standard of care. At his deposition he explained
that although “I don’t want to clip the hepatic duct,” “[t]he view from the laparoscope is not
optimal and not recognized as optimal and illusions can be created in which the ducts could be
clipped.” He clarified: “illusions can occur in a two-dimensional video image that can create an
illusion that, according to standard anatomy, the cystic duct and cystic artery are what they
appear to be, but the common bile duct in this case was in that illusion.” In Dr. Misra’s
estimation, this complication occurs in 0.5 to 2 percent of all laparoscopic gallbladder surgeries.
Dr. Misra has performed approximately 3,000 to 5,000 such procedures and twice clipped the
wrong duct, Elher’s surgery included. In the other case, he recognized the error during the
operation.

 Dr. Priebe, an associate professor of surgery at Case Western Reserve University,
performs 50 to 80 laparoscopic gallbladder surgeries each year and has done so since learning
the technique in 1990. He expressed that “absent extensive inflammation or scarring . . .
virtually every case of . . . major bile duct injury . . . , in my opinion, would be malpractice.” Dr.

 -3-
Priebe opined that regardless of a surgeon’s particular operative approach, “the general rule is
that everything should be identified before anything is cut, any major structure.” He admitted to
having personally injured a patient’s common bile duct when “the anatomy couldn’t be
delineated because of the scarring and inflammation[.]” When asked whether he could “cite to
any medical literature” supporting his standard of care opinion, Dr. Priebe replied: “[M]edical
literature doesn’t discuss standard of care,” later reprising: “[t]here is no authority that exists to
do that.” Dr. Misra violated the standard of care, Dr. Priebe submitted, “as it relates to
delineating the anatomy as he performed the laparoscopic cholecystectomy.”

 Dr. John Webber, a general surgery expert proffered by defendants, admitted that bile
duct injuries may result from medical negligence: “I’m saying there are instances where you can
have an injury to the common [bile] duct and it could be malpractice and there are instances
where it wouldn’t be malpractice.” He disagreed that bile duct injuries occurring during
uncomplicated surgeries qualify as negligent per se. Dr. Webber partially premised his opinion
on an editorial written by Dr. Josef E. Fischer in The American Journal of Surgery. According to
Dr. Webber, the editorial stands for the proposition that “bile duct injuries can occur and is [sic]
an inherent risk of the procedure without being below the standard of care.”

 Dr. Fischer’s essay, a centerpiece of defendants’ legal argument, is labeled by The
American Journal of Surgery as an “Editorial Opinion.”2 The abstract states:

 The author believes that injury to the common duct during laparoscopic
 cholecystectomy is not a result of the practice below the standard, but an inherent
 risk of the operation. This injury needs to be emphasized by the surgical
 community as an inherent risk of the operation, and patients should be fully
 informed of this potential complication. [Fischer, Is Damage to the Common Bile
 Duct During Laparoscopic Cholecystectomy an Inherent Risk of the Operation?,
 197 The American Journal of Surgery 829, 829 (2009).]

Because the Fischer editorial figures prominently in this case, we highlight several additional
portions.

 Dr. Fischer observed that bile duct injury occurs slightly more frequently in the
laparoscopic gallbladder procedure than in conventional, open operations. Id. at 830. He
reviewed various techniques for correctly identifying the bile duct anatomy, observing that
“[a]ny or all of these together can help decrease the incidence of common duct injury, but the
methods are not foolproof.” Id. Despite precautions, Dr. Fischer opined, common duct injuries
occur, and “[s]omehow the trial bar has converted a complication of a procedure that has
remained stable, can seemingly occur to anyone, and can occur to acknowledged skilled
surgeons, into ‘practice below the standard.’ ” Id.

2
 We note that the copy of the Fischer article provided to the trial court was so poorly reproduced
that it was essentially unreadable, and appears not to include the heading “Editorial Opinion.”
Because we could not read the record version of the article, we obtained a copy directly from the
journal. We have attached the first page of the article as an exhibit to this opinion.

 -4-
 Dr. Fischer cited a study performed by Dr. Lawrence Way and several other surgeons
concluding that “‘practice below the standard’ is not a cause of 97% of bile duct injuries.” Id. at
831. Two other published articles, Dr. Fischer claimed, “came close to declaring that common
duct injury, after going through the usual drill of how to avoid it, might not be ‘practice below
the standard.’ ” Id. Dr. Fischer concluded with the following pertinent paragraphs:

 One feels strange arguing that an acknowledged complication of a
 commonly performed procedure is not “practice below the standard.” However, it
 would seem to me that if one persisted and tried to determine in 2 or 3 or even 4
 ways what the anatomy was so as not to damage the common duct and the
 common duct was damaged nonetheless, that this is certainly not “practice below
 the standard.” I know I may be opposed by some hepatobiliary surgeons who
 would argue that “if you don’t know what you you’re doing, you shouldn’t do it.”
 But I have seen really excellent and highly experienced surgeons somehow
 damage the common duct inadvertently.

 Surgery is not a science. It is an art. It is not an arcane art. It can be
 learned by anyone and mentoring helps. However, it does appear that even the
 most experienced laparoscopic surgeon can sometimes fall afoul of the vagaries
 of the art of surgery.

 This article will draw howls undoubtedly not only from the legal bar but
 also from some experienced surgeons who are purists. I do not believe that that is
 appropriate. We put our egos and our skill on the line every time we enter the
 operating room and sometimes that skill is insufficient despite out best efforts. . . .
 [Id.]

 Defendants filed several additional medical articles with the trial court, including the
article authored by Dr. Way. The articles generally discuss bile duct injuries and their causes.
The Way article begins as follows: “Bile duct injuries are the main serious technical
complication of laparoscopic cholecystectomy.” Way et al, Causes & Prevention of
Laparoscopic Bile Duct Injuries, 237 Annals of Surgery 460, 460 (2003). In it, the authors
analyze 252 operations involving bile duct injuries by applying “scientific principles from human
factors research and cognitive psychology.” Id. at 468.3 The article posits that the authors
considered some surgical errors resulting in bile duct injuries “to represent faulty decision-
making or a knowledge error if the data indicated that . . . the surgeon had departed from the
orthodox operative strategy for performing a laparoscopic cholecystectomy . . . .” Id. at 461. It
continues: “We considered that the fault was at the action or skill level when there was evidence
that the dissection was performed in a clumsy way; when an identified duct being cleared of
connective tissue was accidentally cut or cauterized.” Id. Many injuries, the authors concluded,
were due to “misperception . . . at a subconscious level in response to certain uncommon
anatomic illusions.” Id. at 468. Misperception errors, the authors submitted, “do[] not meet the

3
 We note that the authors of the Way article are all physicians. The article does not describe
their expertise, if any, in the science of human factors.

 -5-
defining criteria of medical negligence.” Id. The remaining articles filed by defendants do not
discuss standard of care issues.4

 Defendants sought summary disposition pursuant to MCR 2.116(C)(10) on three grounds.
First, defendants asserted, Dr. Priebe’s opinions lacked reliability under MRE 702. The crux of
defendants’ argument was that Dr. Priebe could not point to any peer-reviewed literature
endorsing his view of the standard of care, and disdained consideration of his colleagues’ views.
The Fischer editorial, defendants argued, supported that bile duct injuries are not the result of
medical negligence. Defendants next alleged that because injury to the common bile duct is a
recognized complication of laparoscopic cholecystectomy, the res ipsa loquitur doctrine did not
apply. Defendants further argued that Elher failed to properly plead damages and did not have
sufficient expert testimony with regard to causation. Elher filed a responsive brief, but failed to
put forward any evidence buttressing Dr. Priebe’s opinions.

 The trial court ruled that Dr. Priebe’s opinions were not reliable, summarizing:

 The problem here is that Plaintiff does not squarely address the issue of
 whether her expert’s testimony is reliable under MRE 702 or even meets any of
 the requirements of MCL 600.2955. Plaintiff merely points to Dr. Priebe’s
 experience and background arguing that his opinion is reliable and therefore
 admissible. However, Plaintiff must present more than his own opinions, his
 “stellar” credentials, and the number of procedures he has performed. Plaintiff
 cannot merely conclude without more that the opinion of Dr. Priebe is based on
 sufficient facts or data.

Dr. Priebe’s testimony was deficient, the trial court found, because it did not conform to the
MRE 702:

 Here, there is no evidence that Dr. Priebe’s opinion and its basis have been
 subjected to scientific testing and replication. There is no evidence that Dr.
 Priebe’s opinion and its basis have been subjected to peer review publication.
 There is no evidence as to the degree to which the opinion and its basis are
 generally accepted within the relevant expert community. To the contrary, Dr.
 Priebe admits there is “no authority” that exists as to his standard of care opinion
 other than his “own belief system.”

 Furthermore, Dr. Priebe cannot cite to any medical literature to support his
 self-definition and belief system. According to Dr. Priebe, medical literature does
 not discuss standard of care or otherwise support his opinion because the authority

4
 Elher’s counsel filed several articles with this Court in support of Dr. Priebe’s standard of care
testimony. Because the articles were not submitted to the trial court, we have not read or
considered them. See MCR 7.210(A)(1); Sherman v Sea Ray Boats, Inc, 251 Mich App 41, 56;
649 NW2d 783 (2002) (“This Court's review is limited to the record established by the trial
court, and a party may not expand the record on appeal.”).

 -6-
 does not exist. He acknowledges that there are national and local colleagues who
 disagree with his exception for extensive inflammation or scarring, but discounts
 those opposing views as just others being entitled to their opinions. He is not
 aware of any General Surgery colleague at Case Western who agrees with that,
 other than extensive scarring or inflammation, it is always breach of the standard
 of care to injure the common bile duct during a laparoscopic cholecystectomy.
 He does not know of any board-certified general surgeons who agree with him
 that it is always a breach of the standard of care to injure the common bile duct
 during laparoscopic cholecystectomy surgery, unless there is extensive scarring or
 inflammation.

 The trial court next found the res ipsa loquitur doctrine inapplicable, as injury to the
common bile ducts constitutes a risk of the procedure and the causes of this complication were
not within the common understanding of lay jurors. After ruling the res ipsa loquitur doctrine
inapposite and Dr. Priebe’s testimony “unreliable and inadmissible,” the trial court granted
summary disposition in favor of defendants. The trial court did not address defendants’
argument that plaintiff had failed to establish her claim for damages. Elher appeals.

 II. ANALYSIS

 The facts underlying this case are not in dispute. Dr. Misra mistook Elher’s common bile
duct for her cystic duct. He clipped both rather than just the cystic duct. The medical experts
agree that the common bile duct should not have been clipped, and that the injury to Elher’s
common bile duct occasioned extensive repair surgery. The debate centers on whether Dr.
Misra’s error qualifies as surgical negligence or excusable error—a nonnegligent accident
precipitated by perception problems produced by the equipment. Science cannot settle this
dispute. Because the experts’ disagreement boils down to a difference of opinion regarding an
issue outside the realm of scientific methodology, neither MRE 702 nor MCL 600.2955 stands in
the way of Dr. Priebe’s testimony.

 We review for an abuse of discretion a circuit court’s evidentiary rulings. People v
Farquharson, 274 Mich App 268, 271; 731 NW2d 797 (2007). When our inquiry concerns
whether the trial court correctly applied a rule of evidence, our review is de novo. People v
King, 297 Mich App 465, 472; 824 NW2d 258 (2012). Thus, we apply de novo review in
assessing whether the trial court performed its gatekeeping role in conformity with the legal
principles articulated in Gilbert v DaimlerChrysler Corp, 470 Mich 749; 685 NW2d 391 (2004),
in which our Supreme Court adopted the Daubert framework.5 If the trial court correctly
executed its gatekeeping role, we review its ultimate decision to admit or exclude scientific
evidence for an abuse of discretion. Craig v Oakwood Hosp, 471 Mich 67, 76; 684 NW2d 296
(2004). When a trial court excludes evidence based on an erroneous interpretation or application
of law, it necessarily abuses its discretion. Kidder v Ptacin, 284 Mich App 166, 170; 771 NW2d
806 (2009).

5
 Daubert v Merrell Dow Pharm, Inc, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

 -7-
 A. MRE 702

 We begin our analysis with MRE 702, which governs the admission of expert testimony:

 If the court determines that scientific, technical, or other specialized
 knowledge will assist the trier of fact to understand the evidence or to determine a
 fact in issue, a witness qualified as an expert by knowledge, skill, experience,
 training, or education may testify thereto in the form of an opinion or otherwise if
 (1) the testimony is based on sufficient facts or data, (2) the testimony is the
 product of reliable principles and methods, and (3) the witness has applied the
 principles and methods reliably to the facts of the case.

The Court of Appeals for the Third Circuit has referred to the substantively similar FRE 702’s
parameters as embodying “a trilogy of restrictions on expert testimony: qualification, reliability,
and fit.” Schneider ex rel Estate of Schneider v Fried, 320 F3d 396, 404 (CA 3, 2003). Here, the
sole issue is reliability.

 MRE 702 explicitly incorporates the standards of admissibility set forth in Daubert.
Gilbert, 470 Mich at 782. Daubert focuses on evidentiary reliability. To assist judges in
performing the requisite analysis, the Supreme Court outlined four factors that might assist
judges in gauging reliability: 1) whether the expert’s theory can be and has been tested; 2)
whether the theory has been subjected to peer review or publication; 3) the theory’s known or
potential rate of error and the existence of standards controlling the technique’s operation; and 4)
the extent to which the methodology or technique employed by the expert is generally accepted
in the scientific community. Daubert, 509 US at 593-594.

 This analysis does not hinge on discovering “absolute truth” or resolving “genuine
scientific disputes.” Chapin v A & L Parts, Inc, 274 Mich App 122, 127; 732 NW2d 578 (2007).
“[I]t would be unreasonable to conclude that the subject of scientific testimony must be ‘known’
to a certainty; arguably, there are no certainties in science.” Daubert, 509 US at 590. Rather, the
trial court is tasked with filtering out unreliable expert evidence. “The inquiry is into whether
the opinion is rationally derived from a sound foundation.” Chapin, 274 Mich App at 139. “The
standard focuses on the scientific validity of the expert’s methods rather than on the correctness
or soundness of the expert’s particular proposed testimony.” People v Unger, 278 Mich App
210, 217-218; 749 NW2d 272 (2008). The United States Supreme Court emphasized in
Daubert,

 The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching
 subject is the scientific validity—and thus the evidentiary relevance and
 reliability—of the principles that underlie a proposed submission. The focus, of
 course, must be solely on principles and methodology, not on the conclusions that
 they generate. [Daubert, 509 US at 594-595].

 In Kumho Tire Co, Ltd v Carmichael, 526 US 137, 152; 119 S Ct 1167; 143 L Ed 2d 238
(1999), the United States Supreme Court reviewed and clarified the reliability principles laid out
in Daubert. One question presented in Kumho was whether a trial court evaluating proposed

 -8-
engineering expert testimony “may consider several more specific factors that Daubert said
might ‘bear on’ a judge’s gatekeeping determination.” Id. at 149 (emphasis in original).

 These factors include:

 —Whether a “theory or technique . . . can be (and has been) tested”;

 —Whether it “has been subjected to peer review and publication”;

 —Whether, in respect to a particular technique, there is a high “known or
 potential rate of error” and whether there are “standards controlling the
 technique's operation”; and

 —Whether the theory or technique enjoys “general acceptance” within a “relevant
 scientific community.” [Id. at 149-150 (citation omitted).]

The Supreme Court resolved the inquiry in the following manner: “Emphasizing the word ‘may’
in the question, we answer that question yes.” Id. at 150.

 The Court then expounded on its answer, accenting that the inquiry under Rule 702 is “‘a
flexible one’” in which the factors cited “do not constitute a ‘definitive checklist or test.’” Id.
(emphasis in original). In some cases, the Court volunteered, “the relevant reliability concerns
may focus on personal knowledge or experience.” Id. Using language especially relevant to the
case before us, the Supreme Court continued: “And Daubert adds that the gatekeeping inquiry
must be ‘tied to the facts’ of a particular case.” Id. This means that the Daubert factors “may or
may not be pertinent in assessing reliability, depending on the nature of the issue, the expert’s
particular expertise, and the subject of the testimony.” Id. The Court stressed that the
applicability of the Daubert factors necessarily varies case by case, expert by expert. “Too much
depends upon the particular circumstances of the particular case at issue” to impose hard and fast
rules. Id.

 Our Supreme Court’s opinion in Edry v Adelman, 486 Mich 634; 786 NW2d 567 (2010),
is entirely consistent with this approach. In Edry, the Supreme Court reviewed a trial court’s
exclusion of causation testimony in a medical malpractice case arising from the delayed
diagnosis of breast cancer. The challenged expert witness opined that the delay reduced the
plaintiff’s five-year survival chance to 20%. Id. at 637. The expert maintained this position
even after being confronted with authoritative data reflecting a 60% five-year survival rate, and
failed to substantiate his view with any countervailing literature or data. Id. The Supreme Court
upheld the exclusion of his testimony, holding that it “failed to meet the cornerstone
requirements of MRE 702.” Id. at 640. The Court continued, “Dr. Singer’s opinion was not
based on reliable principles or methods; his testimony was contradicted by both the defendant’s
oncology expert’s opinion and the published literature on the subject that was admitted into
evidence, which even Dr. Singer acknowledged as authoritative.” Id. The testimony was
deficient, the Court summarized, because it lacked “some basis in fact,” as well as a foundation
demonstrating that it drew upon reliable principles or methods, or that the witness had reliably
applied his methods to the facts of the case. Id. at 641.

 -9-
 The Court took pains to point out that “peer-reviewed, published literature is not always a
necessary or sufficient method of meeting the requirements of MRE 702[.]” Id. In that case,
however, “the lack of supporting literature, combined with the lack of any other form of support”
for the expert’s risk calculation rendered his testimony inadmissible. Id.

 We draw from Kumho and Edry several important lessons. A court screening scientific
evidence must ensure that proposed scientific or technical testimony is reliable as well as
relevant. But the algorithm for this analysis cannot be scripted in advance or applied in a
vacuum. Rather, a court must determine which factors reasonably measure reliability given the
specific factual context and contours of the testimony presented.

 Dr. Priebe’s qualifications—his “knowledge, skill, experience, training, [and]
education”—are not in dispute. Given the number of laparoscopic gallbladder surgeries he has
performed (more than 2,000) and his board certification as a general surgeon, he is qualified to
express opinions regarding the standard of care. See also MCL 600.2912a and MCL 600.2169.
Moreover, Dr. Priebe’s testimony elucidates the reasons that his particular experience qualifies
him to opine regarding the standard of care. Dr. Priebe acknowledged that he “keep[s] up to date
with the American College of Surgeons’ materials” regarding laparoscopic cholecystectomy,
participates in Case Western’s weekly morbidity and mortality committee meetings, and teaches
a specific method described in the medical literature for avoiding common bile duct injuries. He
expressed a fully accurate understanding of the meaning of the term “standard of care.” He
readily conceded that “multiple other highly regarded experts . . . disagree with any suggestion
that it’s always a breach of the standard of care” to injure the common bile duct during
uncomplicated laparoscopic gallbladder surgery, stating “yes, there are . . . experts on both sides
of this.” Given this testimony, an adequate foundation demonstrates Dr. Priebe’s familiarity with
the standard of care applicable to general surgeons performing laparoscopic gallbladder surgery.

 Nor has the “fit” of Dr. Priebe’s opinions to the case facts precipitated any “analytical
gap” debate. In fact, the parties agree about the anatomy of the bile duct system, the manner the
surgery is typically performed, the methods available to prevent injury, the consequences of
erroneously severing the common bile duct, and that Dr. Misra believed he had an unobstructed,
clear view of the surgical site.6 Their opinions diverge only as to whether in Elher’s case, Dr.
Misra violated the standard of care by clipping the common bile duct. The question before us is
whether a jury should hear Dr. Priebe’s view.

 MRE 702, enhanced by Daubert, sets forth four familiar reliability guideposts focusing
on testing, peer-review, the known and potential error rate of the expert’s methodology, and
general acceptance of the technique in the relevant scientific community. Consistent with its
“gatekeeper” role, a trial court must also consider the factors listed in MCL 600.2955(1). Clerc v
Chippewa Co War Mem Hosp, 477 Mich 1067, 1068; 729 NW2d 221 (2007). The Legislature
dictated that the following factors inform a trial court’s analysis under MRE 702:

6
 At his deposition Dr. Misra agreed with the statement in his operative report that the cystic duct
had been “well-identified.”

 -10-
 (1) In an action for the death of a person or for injury to a person or
 property, a scientific opinion rendered by an otherwise qualified expert is not
 admissible unless the court determines that the opinion is reliable and will assist
 the trier of fact. In making that determination, the court shall examine the opinion
 and the basis for the opinion, which basis includes the facts, technique,
 methodology, and reasoning relied on by the expert, and shall consider all of the
 following factors:

 (a) Whether the opinion and its basis have been subjected to scientific
 testing and replication.

 (b) Whether the opinion and its basis have been subjected to peer
 review publication.

 (c) The existence and maintenance of generally accepted standards
 governing the application and interpretation of a methodology or technique and
 whether the opinion and its basis are consistent with those standards.

 (d) The known or potential error rate of the opinion and its basis.

 (e) The degree to which the opinion and its basis are generally
 accepted within the relevant expert community. As used in this subdivision,
 “relevant expert community” means individuals who are knowledgeable in the
 field of study and are gainfully employed applying that knowledge on the free
 market.

 (f) Whether the basis for the opinion is reliable and whether experts in
 that field would rely on the same basis to reach the type of opinion being
 proffered.

 (g) Whether the opinion or methodology is relied upon by experts
 outside of the context of litigation.

 (2) A novel methodology or form of scientific evidence may be
 admitted into evidence only if its proponent establishes that it has achieved
 general scientific acceptance among impartial and disinterested experts in the
 field.

 (3) In an action alleging medical malpractice, the provisions of this
 section are in addition to, and do not otherwise affect, the criteria for expert
 testimony provided in [MCL 600.2169]. [MCL 600.2955.][7]

7
 According to the statute’s plain terms, the trial court’s task is to “consider” the factors in
assessing reliability. To “consider” means to “1. to look at carefully; examine 2. to think about
in order to understand or decide; ponder [to consider a problem] 3. to keep in mind; take into

 -11-
Four of the seven factors identified in MCL 600.2955 (subparts (a)-(d)) derive directly from
Daubert, 509 US at 593-594, and overlap with the components of MRE 702. This Court has
held that each of these statutory factors need not favor the proposed expert’s opinion. Chapin,
274 Mich App at 137 (opinion by DAVIS, J.). It suffices that “the opinion is rationally derived
from a sound foundation.” Id. at 139. Kumho explained that a similar approach governs the
application of FRE 703: “Daubert . . . made clear that its list of factors was meant to be helpful,
not definitive. Indeed, those factors do not all necessarily apply even in every instance in which
the reliability of scientific testimony is challenged.” Kumho, 526 US at 151.

 Against this backdrop, we review the trial court’s Rule 702 analysis.

 The trial court rested its decision on three of the Daubert guideposts: the absence of
“scientific testing and replication” for Dr. Priebe’s standard of care view, the lack of evidence
that “Dr. Priebe’s opinion and its basis have been subjected to peer review publication,” and
Elher’s failure to demonstrate “the degree to which [Dr. Priebe’s] opinion and its basis are
generally accepted within the relevant expert community.”

 As to the first—the absence of “scientific testing and replication”—we are unable to
discern any “fit” between this guidepost and the case facts. When an expert testifies concerning
his or her own scientific or technical research, comparable (or incomparable) results obtained
through independent testing and attempts at replication supply valuable reliability measures.
“That the testimony proffered by an expert is based directly on legitimate, preexisting research
unrelated to the litigation provides the most persuasive basis for concluding that the opinions he
expresses were ‘derived by the scientific method.’” Daubert v Merrell Dow Pharm, Inc, 43 F3d
1311, 1317 (CA 9, 1995). Testing and replication assume central importance in product liability
actions in which experts propose alternate designs, or in causation disputes. See Bitler v A O
Smith Corp, 400 F3d 1227, 1235 (CA 10, 2004); Cummins v Lyle Indus, 93 F3d 362, 368 (CA 7,
1996) (“Our cases have recognized the importance of testing in alternative design cases.”).

 Here, however, no testing or “replication” underlies either side’s expert opinions. And
we fail to understand how standard-of-care opinions such as Priebe’s could ever be tested or
replicated. How does one scientifically “test” whether severing the wrong bile duct is a breach
of the standard of care? Physical recreation or reenactment of Elher’s surgery is neither feasible
nor helpful; some conclusions simply defy measurement or verification through randomized
clinical trials. The Massachusetts Supreme Court has similarly concluded that “testing” lacks
relevance in the standard of care context: “[B]ecause the standard of care is determined by the
care customarily provided by other physicians, it need not be scientifically tested or proven
account . . . .” Webster’s New World Dictionary of the American Language (2d College Ed), p
303. We note that in other statutory schemes involving “factors,” the Legislature has required
more than mere consideration. For example, in child custody cases, a court must “consider[],
evaluate[], and determine[]” the identified factors concerning the best interests of the child.
MCL 722.23. When arbitrating a public labor dispute, “the arbitration panel shall base its
findings, opinions, and order upon the following factors. . . .” MCL 423.239. Although the trial
court did not reference any factors other than (a), (b) and (e), defendants have not argued that
any other factors also bear relevance.

 -12-
effective: what the average qualified physician would do in a particular situation is the standard
of care.” Palandjian v Foster, 446 Mass 100, 105; 842 NE2d 916 (Mass, 2006).8 Because Dr.
Priebe’s opinion simply does not implicate any possible testing or replication, the trial court
abused its discretion by using this factor to exclude his testimony.

 Next, we consider peer-review publication. In Edry, our Supreme Court noted that
“while not dispositive, a lack of supporting literature is an important factor in determining the
admissibility of expert witness testimony.” Edry, 486 Mich at 640. To buttress that statement
the Court cited back to Daubert, in which the Supreme Court observed:

 Another pertinent consideration is whether the theory or technique has been
 subjected to peer review and publication. Publication (which is but one element
 of peer review) is not a sine qua non of admissibility; it does not necessarily
 correlate with reliability and in some instances well-grounded but innovative
 theories will not have been published. Some propositions, moreover, are too
 particular, too new, or of too limited interest to be published. But submission to
 the scrutiny of the scientific community is a component of “good science,” in part
 because it increases the likelihood that substantive flaws in methodology will be
 detected. The fact of publication (or lack thereof) in a peer reviewed journal thus
 will be a relevant, though not dispositive, consideration in assessing the scientific
 validity of a particular technique or methodology on which an opinion is
 premised. [Daubert, 509 US at 593-594 (citations omitted).]

Dr. Priebe testified that there is no peer-reviewed literature addressing whether cutting the
common bile duct during laparoscopic gallbladder surgery qualifies as a breach of the standard
of care. Defendants’ article submissions do not rebut that statement.

 The Fischer article is an editorial expressing an opinion. It is not scientific or medical
research, the report of an experiment, or an analysis of data. Instead, the editorial is directed in
part at rebutting “the trial bar”—hardly a scientific endeavor. See Fischer at 830. As an
expression of Dr. Fischer’s personal point of view, it is no more inherently trustworthy than Dr.
Priebe’s thesis. At best, both represent but one doctor’s opinion. Although Dr. Fischer’s views
were published in a medical journal, the article shares none of the hallmarks of peer-reviewed
research. Peer review subjects an article to critical, rigorous analysis. Peer-reviewed medical
articles often include reviewers’ comments, or at least some indication of peer review. And even
assuming that the editors of The American Journal of Surgery read and approved publication of

8
 “However, when the proponent of expert testimony incorporates scientific fact into a statement
concerning the standard of care, that science may be the subject of a [Daubert] inquiry.”
Palandjian, 446 Mass at 108-109. For example, in Palandjian, the Massachusetts Supreme
Court held that whether a patient was actually at increased risk of gastric cancer presented an
issue subject to challenge by application of the Daubert guideposts. Similarly, whether a
particular therapy likely would have prevented injury or death presents a testable question. The
results of such testing may well dictate the standard of care or negative a causation claim.

 -13-
Dr. Fischer’s editorial, we are hard pressed to conclude that this screening process qualifies as
true peer review. “At its most basic level, true peer review occurs whenever a scientist replicates
and tests research results shared by another scientist.” Chan, Note, The “Brave New World” of
Daubert: True Peer Review, Editorial Peer Review, and Scientific Validity, 70 NYU L Rev 100,
113 (1995). “Neither courts nor scientists should blithely assume that publication in a
purportedly ‘peer-reviewed’ journal is a seal of approval for a particular methodology or theory.”
Anderson, Parsons, & Rennie, Daubert’s Backwash: Litigation-Generated Science, 34 U Mich J
L Ref 619, 637 (2001). See also Valentine v Pioneer Chlor Alkali Co, Inc, 921 F Supp 666, 675
(D Nev, 1996) (“Editorial peer review ‘is not and cannot be an objective scientific process, nor
can it be relied upon to guarantee the validity or honesty of scientific research, despite much
uninformed opinion to the contrary.’”).

 Moreover, the Fischer article supports rather than refutes Dr. Priebe’s thesis that common
bile duct injuries can represent standard of care violations. The article quotes other literature
representing that “practice below the standard” is not a cause of “97% of bile duct injuries,” and
further provides that “common [bile] duct injury . . . might not be ‘practice below the standard.’ ”
Fischer at 831 (emphasis added). We take this to mean that in some cases, injury to the common
bile duct is a standard of care violation. Dr. Fischer specifically references the conflicting views
of other surgeons: “I know I may be opposed by some hepatobiliary surgeons who would argue
that ‘if you don’t know what you you’re doing, you shouldn’t do it.’” Id. Indeed, Dr. Fischer
refers to proponents of this view as “purists,” acknowledging that his standard of care argument
would “draw howls” from both “experienced surgeons” and “the legal bar.” Id. Similarly, Dr.
Way’s article acknowledges that some bile duct injuries are the product of “faulty decision
making” or “knowledge error[s],” terms consistent with negligence concepts. Way at 461. In
other words, the record evidence demonstrates surgical experts’ agreement that common bile
duct injuries sometimes result from standard of care violations.9

 We draw from Dr. Fischer’s editorial and the Way article the obvious lesson that under
some circumstances, a breach of the standard of care may constitute the proximate cause of a
common bile duct injury. How to define those circumstances is a hot-button question among

9
 And according to Dr. Fischer, this entire discussion falls outside the realm of science: “Surgery
is not a science. It is an art.” Fischer at 831. The Massachusetts Supreme Court concurred with
this sentiment in Palandjian v Foster, 446 Mass 100, 108-109; 842 NE2d 916 (2006):

 We agree with the plaintiffs that expert testimony concerning the standard of care
 generally need not be subject to a Daubert-Lanigan analysis. Such testimony is
 based on the expert’s knowledge of the care provided by other qualified
 physicians, not on scientific theory or research: “How physicians practice
 medicine is a fact, not an opinion derived from data or other scientific inquiry by
 employing a recognized methodology.” However, when the proponent of expert
 testimony incorporates scientific fact into a statement concerning the standard of
 care, that science may be the subject of a Daubert-Lanigan inquiry. [Citations
 omitted.]

 -14-
surgeons. But Daubert and MRE 702 focus “on principles and methodology, not on the
conclusions that they generate.” Daubert, 509 US at 595. If an expert’s reasoning is based on
scientific principles, knowledge, experience and training, the testimony may fulfill the reliability
standards even in the presence of conflicting conclusions predicated on precisely the same data,
and an identical quantum of practical wisdom. This holds true even when a judge finds one
side’s approach more persuasive. The clashing standard of care opinions in this case are exactly
the sort that “[v]igorous cross-examination, presentation of contrary evidence, and careful
instruction on the burden of proof” is designed to resolve. Id. at 596.

 Thus, the trial court abused its discretion by relying on “peer-review” as a reason to
exclude Dr. Priebe’s testimony. No evidence supports that the standard-of-care issue debated by
the parties’ experts has been tested, analyzed, investigated or studied in peer-reviewed articles.
To the contrary, the supplied articles attest that well-qualified surgeons are enmeshed in vigorous
debate about this question, and respect each others’ views.10 The experts disagree about the
conclusions to be drawn from their collective experience, skill and training, rather than about
science or methodology of laparoscopic gallbladder surgery.

 Finally, we turn to the trial court’s concern that “[t]here is no evidence as to the degree to
which the opinion and its basis are generally accepted in the relevant expert community.” The
“general acceptance” factor and its limitations are at the heart of the Supreme Court’s opinion in
Daubert.

 Justice Blackmun’s analysis in Daubert commences with a review of the “general
acceptance” test for admissibility embodied in Frye v United States, 293 F 1013 (DC Cir, 1923).
Frye involved evidence derived from a “crude precursor to the polygraph machine.” Daubert,
509 US at 585. The Supreme Court identified the following “famous (perhaps infamous)
passage” as encapsulating the Frye rule:

10
 The Way article may qualify as peer-reviewed. However, this article explicitly recognizes that
“faulty decision-making or a knowledge error” accounted for some of the bile duct injuries
studied. Way at 461. This conclusion once again aligns with Dr. Priebe’s opinion. Moreover,
the “standard of care” definition utilized in the article is patently incorrect. The authors state:
 The theory underlying malpractice law rests on the principle that the
 patient has a fiduciary relationship to the patient, and as a consequence the patient
 can expect the physician’s care to be of a certain high quality, defined as the
 standard of care. [Id. at 467.]

In Michigan, the applicable standard of care is that of the “ordinary” general surgeon. M Civ JI
30.01. “High quality” is not part of the equation. Given the article’s implicit recognition that
negligent errors sometimes cause common bile duct injuries and its definitional inaccuracy, we
cannot conclude that it validates the proposition for which defendants have offered it: that bile
duct injuries are never the product of surgical malpractice.

 -15-
 “Just when a scientific principle or discovery crosses the line between the
 experimental and demonstrable stage is difficult to define. Somewhere in this
 twilight zone the evidential force of the principle must be recognized, and while
 courts will go a long way in admitting expert testimony deduced from a well-
 recognized scientific principle or discovery, the thing from which the deduction is
 made must be sufficiently established to have gained general acceptance in the
 particular field in which it belongs.” [Id. at 585-586, quoting Frye, 293 F at 1014
 (emphasis in original).]

This test, the Supreme Court held, was superseded by FRE 702. And “nothing in the text of this
Rule establishes ‘general acceptance’ as an absolute prerequisite to admissibility.” Daubert, 509
US at 588. The Court continued: “Nor does respondent present any clear indication that Rule
702 or the Rules as a whole were intended to incorporate a ‘general acceptance’ standard.” Id.

 In addition to rejecting Frye’s “general acceptance” mandate on these grounds, the
Supreme Court reasoned that Frye cannot be reconciled with the letter or the spirit of the federal
rules of evidence:

 [A] rigid “general acceptance” requirement would be at odds with the “liberal
 thrust” of the Federal Rules and their “general approach of relaxing the traditional
 barriers to ‘opinion’ testimony.” Given the Rules’ permissive backdrop and their
 inclusion of a specific rule on expert testimony that does not mention ‘general
 acceptance,’ the assertion that the Rules somehow assimilated Frye is
 unconvincing. Frye made “general acceptance” the exclusive test for admitting
 scientific testimony. That austere standard, absent from, and incompatible with,
 the Federal Rules of Evidence, should not be applied in federal trials. [Id. at 588-
 589 (citations omitted).]

 Despite having cast aside “general acceptance” as the sine qua non of admissibility, the
Supreme Court reserved a place for consideration of this factor in a trial court’s assessment of
whether the reasoning or methodology underlying expert testimony is scientifically valid:

 A “reliability assessment does not require, although it does permit, explicit
 identification of a relevant scientific community and an express determination of
 a particular degree of acceptance within that community.” Widespread
 acceptance can be an important factor in ruling particular evidence admissible,
 and “a known technique which has been able to attract only minimal support
 within the community” may properly be viewed with skepticism. [Id. at 594
 (citations omitted).]

 Dr. Priebe grounded his opinions in his own experience and training, and denied any
awareness of whether his viewpoint was generally shared by other general surgeons. Aside from
polling board-certified general surgeons on the question (which would raise a host of vexing
methodology issues), we are unpersuaded that “widespread acceptance” of a standard of care

 -16-
statement can be found.11 Moreover, the record reflects no disagreement about the standard-of-
care in this case: a surgeon performing laparoscopic gallbladder surgery must strive to avoid
injury to the common bile duct. This standard remains unchallenged by defendants. The parties
diverge only as to the circumstances that give rise to a breach of that standard.

 The dissent blurs this critical distinction. According to our dissenting colleague,
“Defendants maintain that a common bile duct injury is a known complication to a laparoscopic
cholecystectomy which may occur even when” the procedure has been executed “in a reasonable
manner consistent with the governing standard of care.” In contrast, the dissent asserts, Dr.
Priebe “has opined that, in the absence of scarring or inflammation, the standard of care requires
a physician performing a laparoscopic cholecystectomy not to clip the common bile duct under
any circumstance.” This comparison conflates the standard of care with the actions or inactions
constituting a breach of that standard. The record evidence demonstrates that the parties agree
that the standard of care is precisely what Dr. Priebe said it was: operating surgeons must
endeavor to carefully identify the bile ducts to avoid cutting or clipping the common bile duct.
Defendants’ experts never challenged this proposition. Rather, the experts dispute whether a
physician deviates from the care expected of a reasonable physician when, despite clear visibility
of the anatomy, the physician clips the common bile duct.

 Thus, Dr. Priebe’s knowledge of standard of care, and that the standard of care flows
from national norms, is a given. Nor does the record sustain the dissent’s contention that only
Priebe’s “personal views” buttress his opinion that clipping Elher’s common bile duct constitutes
a breach of the standard. The Fischer and Way articles verify that “purists” in the surgical world
agree with Priebe, and consider injuries such as Elher’s to be malpractice. Dr. Priebe echoes
those “purists.”

 Dr. Priebe’s opinion in this case, distilled to its essence, hardly qualifies as novel,
groundbreaking, or even dubious. Relying on Dr. Misra’s sworn testimony that Elher’s
gallbladder area was not scarred or inflamed and that through the laprascope, the cystic duct was
“well-identified,” Dr. Priebe opined that Dr. Misra breached the standard of care by clipping the
wrong duct. Dr. Priebe’s extensive experience in laprascopic gallbladder surgery qualified him
to opine as to what could and should have been seen when the anatomy is clearly delineated. In
Dickenson v Cardiac & Thoracic Surgery of Eastern Tennessee, PC, 388 F3d 976 (CA 6, 2004),

11
 The record contains no evidence of a widely-accepted statement regarding whether clipping
the common bile duct during uncomplicated laparoscopic cholecystecomy surgery qualifies as
medical negligence. And even if such a statement existed, some courts have held that Daubert’s
reliability factor simply does not contemplate “delegating to industry groups the gatekeeping
duties of the courts.” Adams v Lab Corp of America, 760 F3d 1322, 1334 (CA 11, 2014). See
also Marietta v Cliffs Ridge, Inc, 385 Mich 364, 370; 189 NW2d 208 (1971). Employing a
similar analysis, the Florida Supreme Court has held that an expert in a medical malpractice
action may not “bolster” his standard of care testimony by referring to consultations with other
experts. Linn v Fossum, 946 So2d 1032, 1039 (Fla, 2006).

 -17-
the Sixth Circuit reached the same conclusion, holding that a physician’s experience and training
sufficed to render his opinion scientifically reliable. The Sixth Circuit expounded:

 Daubert’s role of “ensuring that the courtroom door remains closed to junk
 science,” is not served by excluding testimony such as Dr. Johnson’s that is
 supported by extensive relevant experience. Such exclusion is rarely justified in
 cases involving medical experts as opposed to supposed experts in the area of
 product liability.” [Id. at 982 (citation omitted).]

Dickenson instructs that a physician need not “demonstrate a familiarity with accepted medical
literature or published standards in [an area] of specialization in order for his testimony to be
reliable in the sense contemplated by Federal Rule of Evidence 702.” Id. at 980. Rather, “ ‘the
text of Rule 702 expressly contemplates that an expert may be qualified on the basis of
experience.’ ” Id., quoting Fed R Evid 702 advisory committee note (2000 Amendments)
(emphasis in Dickenson). The Third Circuit reached a similar conclusion in Schneider, 320 F3d
at 406, finding the challenged expert’s testimony reliable based on his experience. That
experience, the Third Circuit explained, sufficed as “good grounds” for the expert’s standard of
care opinion. Id.

 No objective, verifiable evidence presented to the trial court addresses whether Dr.
Priebe’s view lacks “general acceptance.” This is not surprising, as unlike many questions in
medicine or science, the question is simply not an empirical one. Research, data collection, and
testing cannot supply an answer. Accordingly, the “general acceptance” guidepost is not
pertinent here. Whether injuring the common bile duct during uncomplicated laparoscopic
gallbladder surgery is a standard of care violation calls for a value judgment derived largely from
an expert’s education training and experience, not a scientific pronouncement. Such opinions are
not the product of “methodology” or “technique.” Rather, the reliability of an opinion that
cannot be tested, replicated, or objectively analyzed depends on “whether the expert’s
qualifications create a foundation adequate to support the expert's statement of the standard of
care.” Palandjian, 446 Mass at 108 n 12.

 Moreover, holding Dr. Priebe’s testimony inadmissible because it lacks “general
acceptance” would fly in the face of Daubert: “Nothing in the text of this Rule establishes
‘general acceptance’ as an absolute prerequisite to admissibility.” Daubert, 509 US at 588.
Daubert rejected Frye’s rigid and “austere” application of the “general acceptance” test, and we
perceive no reason to resurrect Frye in a case involving legal rather than scientific judgments.12

12
 We note that MCL 600.2955(1)(c) mentions “general acceptance” as a factor for
consideration: “The existence and maintenance of generally accepted standards governing the
application and interpretation of a methodology or technique and whether the opinion and its
basis are consistent with those standards.” The parties have not brought forward any “generally
accepted standards” that would foreclose the experts’ opinions. MCL 600.2955(2) states: “A
novel methodology or form of scientific evidence may be admitted into evidence only if its
proponent establishes that it has achieved general scientific acceptance among impartial and

 -18-
 Defendants and the dissent make much of Dr. Priebe’s concession that he has never
discussed his view of the standard of care with “his colleagues” at Case Western. According to
defendants and the dissent, Dr. Priebe improperly testified to the standard of care based only on
his personal “belief system,” thereby proving its outlier status. Here is the specific testimony at
issue:

 Q. To reiterate, we’re here at your deposition four months before trial. You’ve
 reviewed the materials that you felt were pertinent in this case, and you know
 you're here today to offer your final standard-of-care opinions, true?

 A. That’s correct.

 Q. And as it relates to that opinion, you cannot cite to a shred of medical
 literature, a medical authority, to support that opinion other than your own belief
 system, true?

 A. There is no authority that exists to do that, so that’s true. But there is no
 authority that does that. So the answer is true.

 Once qualified as an expert, a witness expounds on that which the expert believes to be
true, based on the expert’s “knowledge, skill, experience, training or education.” MRE 702.13
By applying available gatekeeping tools, the trial court determines whether the expert’s
testimony will assist the jury and derives from a reliable methodology. If medical or scientific
literature defines a standard of care, that literature is certainly pertinent to the court’s analysis.
Here, however, the record supports Dr. Priebe’s assessment that “no authority” and no literature
define what constitutes a breach of the standard of care. Different doctors have different
viewpoints on the subject. Contrary to defendants’ argument, no rule of evidence and no case
law require that an expert’s standard of care opinion be universally accepted, or that an expert
affirmatively demonstrate that his or her standard of care view falls within “the mainstream.”
Gatekeeping courts are not empowered “to determine which of several competing scientific
theories has the best provenance.” Ruiz-Troche v Pepsi Cola of Puerto Rico Bottling Co, 161
F3d 77, 85 (CA 1, 1998). The test is whether the expert’s reasoning is scientifically sound.
Moreover, imposing a universal acceptance test on testimony addressing a physician’s breach or
adherence to the standard of care would effectively eliminate medical malpractice litigation.
Obviously, whether the standard of care has been breached is the central point of disagreement in
most malpractice cases. The opinions on this score, while flowing from medical experience,
training and literature, are not susceptible to proof by application of the scientific method, or
objective verification, and therefore will vary based on the individual facts of each case.

disinterested experts in the field.” There is nothing “novel” about the scientific evidence
presented here.
13
 MRE 702 permits a qualified expert to testify “in the form of an opinion[.]” Webster’s New
World Dictionary defines “opinion” as: “a belief not based on absolute certainty or positive
knowledge but on what seems true, valid, or probable to one’s own mind; judgment.” Thus, an
expert’s view as expressed in a courtroom flows from personal beliefs.

 -19-
 Dr. Misra admitted to clipping the wrong duct despite having “well-identified” the cystic
duct. Dr. Priebe concludes that Dr. Misra should have correctly identified the anatomy—
including the common bile duct—before clipping anything. Defendants claim that sometimes
“illusions” get in the way, preventing clear delineation of the anatomy. Daubert was not
designed to close the courtroom door on reasonable disagreements among qualified experts
regarding the scientifically-supportable conclusions to be drawn from uncontested facts. Rather,
such opinion clashes are for juries to resolve.

 Ultimately, the gatekeeping inquiry asks whether the expert has reached his or her
conclusions in a sound manner, and not whether the expert’s conclusions are correct. “Vigorous
cross-examination, presentation of contrary evidence, and careful instruction on the burden of
proof are the traditional and appropriate means of attacking shaky but admissible evidence.”
Daubert, 590 US at 597. Alternatively stated, the trial judge is “a gatekeeper, not a fact finder.”
United States v Sandoval-Mendoza, 472 F3d 645, 654 (CA 9, 2006). Here, application of
immaterial Daubert factors led the trial court to exclude expert testimony possessing none of the
hallmarks of “junk science.” “[N]o one denies that an expert might draw a conclusion from a set
of observations based on extensive and specialized experience.” Kumho, 526 US at 156. Dr.
Priebe demonstrated specialized knowledge regarding the subject type of surgery and the
standards of care that would assist the jurors in deciding the central issue presented in the case.
The trial court abused its discretion by excluding this testimony.

 B. RES IPSA LOQUITUR

 The trial court correctly concluded that the res ipsa loquitur doctrine does not apply to
Elher’s medical malpractice claims.

 The doctrine of res ipsa loquitur “entitles a plaintiff to a permissible inference of
negligence from circumstantial evidence.” Jones v Porretta, 428 Mich 132, 150; 405 NW2d 863
(1987). The doctrine’s central purpose “is to create at least an inference of negligence when the
plaintiff is unable to prove the actual occurrence of a negligent act.” Id. When applicable, res
ipsa loquitur functions as an evidentiary shortcut, permitting proof by circumstantial inferences
rather than direct evidence. Plaintiffs invoking the res ipsa loquitur doctrine must satisfy the
following conditions:

 (1) the event must be of a kind which ordinarily does not occur in the absence of
 someone’s negligence;

 (2) it must be caused by an agency or instrumentality within the exclusive control
 of the defendant;

 (3) it must not have been due to any voluntary action or contribution on the part of
 the plaintiff; and

 (4) evidence of the true explanation of the event must be more readily accessible
 to the defendant than to the plaintiff. [Woodard v Custer, 473 Mich 1, 6-7; 702
 NW2d 522 (2005) (quotation marks and citation omitted).]

 -20-
The Supreme Court emphasized in Woodard that whether an event does not ordinarily occur in
the absence of negligence “ ‘must either be supported by expert testimony or must be within the
common understanding of the jury.’ ” Id. at 7, quoting Locke v Pachtman, 446 Mich 216, 231;
521 NW2d 786 (1994).

 Although res ipsa loquitur is a doctrine of common sense, expert
 testimony is required when the issue of care is beyond the realm of the layperson,
 that is, where a fact-finder cannot determine whether a defendant’s conduct fell
 below the applicable standard of care without technical input from an expert
 witness. [Maroules v Jumbo, Inc, 452 F3d 639, 644 (CA 7, 2006).]

Such input is required here. The manner in which a surgeon laparoscopically removes a
gallbladder falls far outside the common knowledge of a layperson. So does the question of
whether injury to the common bile duct qualifies as negligence or accident. The doctrine does
not apply.

 We affirm in part, reverse in part, and remand for further proceedings. We do not retain
jurisdiction.

 /s/ Elizabeth L. Gleicher
 /s/ Jane M. Beckering

 -21-